*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0463p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MICHAEL W. BROWN,

*Petitioner-Appellant,*

v.

DAVID SMITH,

*Respondent-Appellee.*

No. 06-2295

_____

Appeal from the United States District Court

for the Eastern District of Michigan at Detroit.

No. 03-73247—Arthur J. Tarnow, District Judge.

Argued: July 23, 2008

Decided and Filed: December 31, 2008

Before: BOGGS, Chief Judge; and MOORE and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Todd Shanker, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellant. Janet A. VanCleve, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Todd Shanker, James R. Gerometta, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellant. Raina I. Korbakis, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

BOGGS, C. J., delivered the opinion of the court, in which MOORE, J., joined. CLAY, J. (pp. 16-20), delivered a separate concurring opinion, in which MOORE, J., also joined.

1

———————————

**OPINION**

———————————

BOGGS, Chief Judge.  Michael Brown, who was convicted of sexually molesting his teenage daughter, appeals the district court's denial of his habeas petition. He argues that his trial attorneys' failure to investigate and obtain records related to his daughter's counseling sessions—which records would have undermined her credibility—denied him the effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1994). The district court, applying the standard of review mandated under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), agreed that Brown's counsels' performance was deficient, but held that Brown had not been prejudiced thereby.  For the reasons that follow, we hold that AEDPA deference does not apply to this case, and, judging under a *de novo* standard, we conclude that Brown was indeed prejudiced by his trial counsels' deficient performance.  We therefore reverse.

## I. Background

In March 2000, Michael Brown was convicted by a jury in Midland County, Michigan, of two counts of first-degree criminal sexual conduct (CSC) and one count of second-degree CSC, stemming from an incident in which Brown was alleged to have sexually fondled his fourteen-year-old daughter, H.B., and forced her to perform oral sex on him.  The defense theory was that H.B. fabricated the story of abuse to thwart her father's impending marriage to his live-in girlfriend, Jane Romankewiz, whom the daughter detested.

At trial, the only direct evidence the prosecution presented of the crime was H.B.'s own testimony that her father had sexually assaulted her on one occasion sometime in early March 1999.  She also testified that, prior to the assault, her father had made inappropriate comments about her developing body, had touched her inappropriately on several occasions, and was physically abusive toward her.  This testimony was partly corroborated by a friend of H.B.'s who testified at the trial, but was also categorically refuted by two other witnesses, Romankewiz and Brown's father.  Approximately four months after the alleged sexual assault, during the second week of July, H.B. told her friend that her father had molested her, and her friend encouraged her to tell her mother (Brown's ex-wife), which she did the next

day. This revelation occurred the week after Romankewiz told H.B. that her divorce would soon become final, thereby paving the way for Romankewiz to marry Brown. Romankewiz testified that H.B. "didn't seem happy at all" about this news.

In her testimony, H.B. denied any dislike for Romankewiz, stating that Romankewiz caused "a little bit" of trouble in her relationship with her father, but that she liked Romankewiz as a person and bore no animosity toward her. She acknowledged that she did not want her father to marry Romankewiz, but said it was because they "didn't get along" and were abusive toward each other. After initially denying that she had written, in a school assignment, that one of her goals was "to make sure [that her] father didn't marry [Romankewiz]," she was forced to recant when defense counsel showed her the assignment in which she had written that goal. The jury, however, resolved the credibility issue in favor of H.B., and convicted Michael Brown on all counts. He was sentenced to ten and a half to twenty-five years in prison.

On direct appeal, Brown unsuccessfully argued that he had been deprived of the effective assistance of counsel because his trial lawyers had failed to investigate H.B.'s counseling sessions with Nancy Parsons (then Nancy Rachow), a therapist with whom H.B. met regularly in the months prior to and immediately after the alleged assault. After denying Brown's request for a *Ginther* hearing to develop this issue,[1] the Michigan Court of Appeals rejected Brown's argument:

> [T]he decision whether to present the victim's counselor in order to impeach the victim was a matter of trial strategy. The proposed impeachment evidence was not substantially different from other evidence presented at trial. Indeed, there are indications in the record, including the attachments to defendant's sentencing memorandum, that the counselor was defendant's friend, that defense counsel did not find her to be credible, and that she did not have knowledge of any inconsistencies or recantations, only her personal opinion that the victim

---

[1] In the Michigan courts, a *Ginther* hearing is an evidentiary hearing related to claims of ineffective assistance of counsel. *See People v. Ginther*, 212 N.W.2d 922, 924 (Mich. 1973). The Michigan Court of Appeals gave no explanation for denying petitioner's request for a *Ginther* hearing. The state court's refusal is perplexing, since there were numerous factual issues related to Brown's claim that were not (and are still not) well developed. Indeed, in a recent case involving similar facts, the Michigan Court of Appeals reversed a trial court's refusal to grant a *Ginther* hearing as an abuse of discretion. *See People v. Couron*, No. 256952, 2006 WL 2708576 (Mich. Ct. App. Sept. 21, 2006) (remanding for a *Ginther* hearing in a sexual abuse case where defense counsel failed to seek to examine the teenage accuser's psychological records).

may be fabricating the allegations of abuse.  Defendant has failed to overcome the presumption of sound trial strategy or shown that there is a reasonable probability that counsel's failure to call this witness deprived him of a substantial defense or otherwise affected the outcome.

*People v. Brown*, No. 227953, 2003 WL 133055, at *4 (Mich. Ct. App. Jan. 3, 2003) (internal citations omitted).

Brown timely filed a habeas petition with the district court in 2003, raising, *inter alia*, this ineffective-assistance-of-counsel claim.  The district court held a hearing on the matter and reviewed Parsons's counseling records *in camera*, after which the district court made the records available to both Brown and the State.

The records could have provided additional grounds for impeachment of H.B.'s testimony.  For example, at trial, H.B. downplayed any animosity between her and her would-be step-mother.  The counseling notes, however, reveal that H.B. told Parsons that "she can't stand [Romankewiz]" and that "she hates [Romankewiz] for the way she tries to change her dad and his relationship with [her]."  Similarly, during the session held immediately prior to her publicly accusing her father of molesting her, H.B. vented about Romankewiz to Parsons: "[H.B.] says she's not used to no relationship with her dad. They have always had one, [Romankewiz] got mad, the D.T. which stood for 'Damned Tramp' called [her] a 'Spoiled Little Bitch', and [Brown]'s 'Precious Little Daughter'." In sum, the notes reveal that H.B. harbored an antipathy towards her probable step-mother much more intense than any revealed at trial.

Additionally, the notes reveal that H.B. was suicidal about two months *before* the alleged assault (she "stuck a gun in her mouth"), show that H.B. was not always truthful with her father (contradicting her testimony at trial), and contain a somewhat cryptic reference to H.B.'s peculiar involvement in an uncle's rape trial: "Uncle Tim Brown, dad's brother was sentenced for rape and [H.B.] gave police witness and she worries about what her uncle will do when he gets out.  Uncle did not rape girl, the girl consented willing."

The district court, operating under the assumption that AEDPA deference applied, "agree[d] that defense counsel should have investigated what Ms. Parsons had to say . . . .  Counsel could not have evaluated or weighed the risks and benefits of calling Ms. Parsons as a witness without so much as contacting her and determining what she would say if called."  *Brown v. Smith*, No. 03-CV-73247-DT, 2006 WL 2669194, at *9 (E.D. Mich. Sept. 18, 2006).  Nevertheless, the district court determined that there was no prejudice, because defense counsel had already impeached the daughter's testimony to a considerable extent on cross-examination, and because much of what the daughter told Parsons was consistent with her testimony at trial—a point the prosecution would surely have emphasized.  The district court concluded:

> Calling Ms. Parsons as a witness would have entailed some risks.  Although she might have been a good . . . witness for [Brown], she also could have provided evidence favorable to the prosecution on cross-examination.  The Court's confidence in the outcome of the trial is not undermined by defense counsel's failure to investigate and present Ms. Parsons as a witness.

*Id.* at *10.  Consequently, the district court denied habeas relief.

## II.  Analysis

The district court erred in presuming that AEDPA's deferential standard applied to this case, and thus its conclusion as to ineffectiveness and prejudice cannot stand.**[2]**  Examining Brown's habeas petition *de novo*, we conclude that his ineffective-assistance-of-counsel claim has merit, and that he is thus entitled to the writ.

---

**[2]**We note, however, that the district court was ill-served in this regard by the petitioning party, who never argued that AEDPA deference did not apply until this appeal.  Nevertheless, a party cannot "waive" the proper standard of review by failing to argue it. *See Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001) ("[T]he court, not the parties, must determine the standard of review, and therefore, it cannot be waived."); *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996) (standard of review is a determination that the court makes for itself).

A.  Standard of Review

AEDPA requires that a state court's adjudication with respect to a habeas claim cannot be overturned unless it is contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d).  This deferential standard of review, however, applies only to a claim that has been "adjudicated on the merits in State court proceedings."  *Ibid.*  Brown argues, and we agree, that his ineffective-assistance-of-counsel claim has not been "adjudicated on the merits" because the counseling notes that form the basis of the claim were not in the record before the Michigan Court of Appeals, and that court explicitly acknowledged that its review was "limited to mistakes apparent on the record."  *Brown*, 2003 WL 133055, at *2.

This circuit has held that, in the context of a *Brady* claim, when the petitioner's habeas claim involves *Brady* material that was uncovered only during the federal habeas proceedings, AEDPA deference does not apply to an earlier, state-court *Brady* adjudication involving a different mix of allegedly improperly withheld evidence. *Joseph v. Coyle*, 469 F.3d 441, 469 (6th Cir. 2006); *see also Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003) ("AEDPA's deference requirement does not apply when a claim made on federal habeas review is premised on *Brady* material that has surfaced for the first time during federal proceedings.").  We think that the same principle applies generally whenever new, substantial evidence supporting a habeas claim comes to light during the proceedings in federal district court.  *See Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (AEDPA deference does not apply where "evidence . . . was adduced only at the hearing before the [federal] magistrate judge" since, without the evidence, "the state courts could not have made a proper determination on the merits."); *cf. Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (noting that where "new evidence is admitted, some Courts of Appeals have conducted *de novo* review on the theory that there is no relevant state-court determination to which one could defer" and "assuming, *arguendo*, that this analysis is correct and that it applies where . . . the evidence does not support a new claim but merely buttresses a previously rejected one").

To be sure, this rule presupposes that the threshold standard for admitting new evidence in the federal district court is met: (1) the petitioner must not be at fault for failing to develop the evidence in state court, or (2) if the petitioner is at fault, the narrow exceptions set forth in 28 U.S.C. § 2254(e)(2) apply.  *See Holland*, 542 U.S. at 652-53 (New evidence may be admitted in federal habeas proceedings "only if respondent was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed by § 2254(e)(2) were met."); *Alley v. Bell*, 307 F.3d 380, 389-90 (6th Cir. 2002).  Here, the district court never made any explicit finding on the threshold matter of whether Brown was at fault for failing to obtain Parsons's counseling records. This court must therefore either remand this case to the district court for such a finding, or independently assess whether Brown met the standard for expanding the evidentiary record in a habeas proceeding.  *See Holland*, 542 U.S. at 653.  We elect to do the latter, because the record is sufficiently clear for us to conclude that Brown was not at fault in failing to obtain the counseling notes during the state post-conviction proceedings. Brown made two motions for a *Ginther* hearing with the Michigan Court of Appeals to develop this evidence; both were denied.  And Parsons herself apparently refused to disclose her counseling notes to Brown or his counsel, in the absence of a court order. Thus, the evidence that supported Brown's previously rejected ineffectiveness claim was not available to Brown until the federal habeas proceeding, when the district court received Parsons's counseling notes, reviewed them *in camera*, and then provided them to the parties.

We conclude that the absence of the counseling records before the Michigan Court of Appeals (through no fault of Brown's), combined with that court's explicit statement that its review was "limited to mistakes apparent on the record," means that there is no relevant state court adjudication to which this court can defer.[3]  Because we hold that AEDPA deference is inapplicable, we review this case under the pre-AEDPA standard of review: *de novo* for questions of law (including mixed questions of law and fact), and clear error for questions of fact.  *See Maples v. Stegall*, 340 F.3d 433, 436 (6th

---

[3]For its part, the State offered no specific rebuttal, either in its brief or at oral argument, to Brown's assertion that AEDPA deference did not apply.

Cir. 2003); *see also Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008) ("The performance and prejudice components of *Strickland* present mixed questions of law and fact and are reviewed *de novo*.").

## B.  Performance of Counsel

*Strickland* sets the standard by which the performance of trial counsel is to be measured: "reasonably effective assistance."  466 U.S. at 687.  Regarding decisions made by trial counsel after "less than complete investigation," the Court explained that such decisions

> are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91.  In accordance with this standard, we assess whether Brown's counsels' decision not to investigate the counseling records they knew existed (by, for example, requesting *in camera* review of those records before the trial court) fell below "an objective standard of reasonableness."  *Id.* at 688.

So far as can be determined from the sparse record before us, the extent of Brown's counsels' "investigation" into Parsons and her counseling records consisted of a two- to three-minute conversation between Parsons and one of Brown's attorneys, Mitchell Nelson, on the third day of trial.  We do not know what was said during this brief meeting between Nelson and Parsons,[4] but no one disputes that Brown's attorneys did not seek *in camera* review of her counseling records, even though, under Michigan law, they were entitled to such review, provided they could establish "a reasonable probability that the privileged records [were] likely to contain material information

---

[4]There are no affidavits in the record from Brown's trial attorneys, and, although Parsons did submit an affidavit (in the form of a letter to the district judge) along with her counseling records, she never mentioned this meeting.  Apparently, neither Brown nor the State made any effort to contact Brown's trial attorneys.

necessary to [Brown's] defense." *People v. Stanaway*, 521 N.W.2d 557, 562 (Mich. 1994); *see also* MICH. CT. R. 6.201(C) (incorporating rule announced in *Stanaway*); *People v. Adamski*, 497 N.W.2d 546, 549-50 (Mich. Ct. App. 1993) (holding, in a case involving a 14-year-old daughter accusing her father of sexual abuse, that Michigan's statutory psychologist-patient privilege must yield to a defendant's constitutional right of confrontation).

We think it likely that Brown could have made the threshold showing that *Stanaway* requires, though we can find no Michigan case explaining precisely what constitutes a "reasonable probability." *Cf. People v. Tessin*, 547 N.W.2d 641, 642 (Mich. 1995) (separate statement by J. Levin) ("There is no decision of this Court or reported decision of the Court of Appeals explicating what constitutes . . . a 'reasonable probability.'"). Although *Stanaway*, along with numerous subsequent Michigan cases,[5] makes clear that a "defendant's generalized assertion of a need to attack the credibility of his accuser d[oes] not establish the threshold showing of a reasonable probability that the records contain information material to his defense," 521 N.W.2d at 562, Parsons herself was clearly sympathetic to Brown's cause (as evidenced by two letters written to the state trial judge in which Parsons expressed her belief that an innocent man had been convicted) and could likely have assisted defense counsel in making the requisite showing, without violating her professional obligations to her young client. For example, Parsons could have provided Brown's attorneys (had they asked) with an affidavit stating that her counseling records contained pertinent information necessary to Brown's defense, without necessarily divulging specifics. Indeed, Parsons herself stated, in one of the aforementioned letters, that she "checked with the State about what needed to be done, in order for me to testify, without breaching the clients [*sic*] confidentiality, and I mailed that information to [Brown's] attorneys." It does not appear that the attorneys took any action in response.

---

[5]*See, e.g.*, *People v. Laird*, No. 276566, 2008 WL 2437543, at *1 (Mich. Ct. App. June 17, 2008); *People v. Clinton*, No. 257699, 2006 WL 397961, at *2 (Mich. Ct. App. Feb. 21, 2006); *People v. Plouhar*, No. 197425, 1999 WL 33438143, at *5 (Mich. Ct. App. July 27, 1999); *People v. Flynn*, No. 185675, 1997 WL 33353585, at *1 (Mich. Ct. App. Mar. 4, 1997).

The prosecution's entire case hinged on the credibility of H.B., and defense counsel were aware that Parsons (who disbelieved H.B.) had treated her near the time of the alleged assault, both before and after the assault.  It was therefore negligent—indeed, constitutionally deficient—for Brown's attorneys not to seek *in camera* review of the counseling records, at least in the absence of any evidence that they had some legitimate reason for not pursuing the records.

The Michigan Court of Appeals, on the record before it, thought that trial counsels' decision not to call Parsons to the stand was a strategic one, and cited "indications in the record, including the attachments to defendant's sentencing memorandum, that the counselor was defendant's friend, that defense counsel did not find her to be credible, and that she did not have knowledge of any inconsistencies or recantations, only her personal opinion that the victim may be fabricating the allegations of abuse." *Brown*, 2003 WL 133055, at *4.  Although, as we have explained, AEDPA deference does not apply to the state court's legal adjudication, its factual determinations must still be presumed correct under 28 U.S.C. § 2254(e)(1).  *See also Strickland*, 466 U.S. at 698 ("[S]tate court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[] . . . .").  Brown has the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

With regard to the state court's assertion that Parsons "did not have knowledge of any inconsistencies," we conclude that Brown has met his burden.  The counseling records, which the state court never reviewed, plainly reveal several inconsistencies between H.B.'s testimony at trial and what she confided to her counselor regarding her relationship with Romankewiz, a relationship that was the basis of the defense strategy to undermine H.B.'s credibility by providing a motive for her to fabricate the abuse allegations.

With regard to the state court's assertion that Brown's counsel did not find Parsons to be credible, we can find no basis in the record to support that statement.  Although the state court cited "indications in the record, including the attachment[] to

[Brown's] sentencing memorandum," as the source for its findings, neither Brown nor the State has been able to point us to any relevant document upon which the state court could plausibly have relied in concluding that Brown's attorneys did not find Parsons to be credible. Indeed, at oral argument, counsel for Brown (a member of the Federal Public Defender's Office) represented that his office had inquired with the clerk of the state court and was informed that no "attachment to the defendant's sentencing memorandum" existed because none was ever filed on behalf of Brown. The State, on the other hand, represented that the transcript of Brown's sentencing hearing does indeed refer to such a memorandum, but that the memorandum was never docketed and no one can find it. Thus we are left in the awkward position of having to assume the correctness of a state court finding when no one can locate any evidentiary support for that finding.

But even assuming that the state court was correct, our quarrel is not with trial counsels' decision to forego calling Parsons as a witness *per se*, but rather with the lack of any reasonable, timely investigation into what she might have offered the defense. Without ever seeking *in camera* review of the counseling records, Brown's counsel could not reasonably have determined what value, if any, those records might have been to his defense, and could not properly have weighed the potential benefit of calling Parsons to the stand (whatever her perceived credibility) against the potential risk. Moreover, even if Parsons were never called as a witness, defense counsel could still have used the counseling records to impeach the daughter on cross-examination.[6] But by the time defense counsel met directly with Parsons (for two to three minutes on the third day of trial), the daughter had already testified, and the opportunity to impeach her testimony directly had passed.

Though we are mindful that, under *Strickland*, the burden is Brown's to overcome the "strong presumption that [his] counsel[s'] conduct f[ell] within the wide

---

[6]This assumes, of course, that the trial court, after *in camera* review, would have determined that Brown was entitled to have access to those records. We think, however, that this proposition is likely, considering the numerous derogatory statements that the daughter made directed toward Romankewiz, the daughter's revelation that she had "stuck a gun in her mouth" approximately two months prior to the alleged assault (indicating the fragile state of her mental health at the time), and various other statements that could also have been used to impeach her testimony.

range of reasonable professional assistance," 466 U.S. at 689, and that he must do so without relying on "the distorting effects of hindsight," *ibid.*, on this record, we agree with the district court that trial counsels' performance fell below an objective standard of reasonableness.

## C. Prejudice

Even where a habeas petitioner demonstrates deficient performance, *Strickland* requires that "the defendant affirmatively prove prejudice" resulting from the ineffectiveness of his counsel. *Id.* at 693. Notably, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Ibid.* Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In making this determination, a court must consider the "totality of the evidence before the judge or jury." *Id.* at 695. Thus, a case in which the "verdict or conclusion [is] only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

In the present case, the only evidence of Brown's guilt was the testimony of his teenage daughter, most of which was uncorroborated.[7] The entire case thus hinged on whether she was believable. The jury concluded that she was, but did so without the benefit of all the information that could have been before them. Specifically, had defense counsel obtained Parsons's counseling records, the jury could have learned that, contrary to H.B.'s testimony on direct examination, H.B. repeatedly expressed marked disdain for Romankewiz—far more intense than that to which she admitted at trial. For example, whereas at trial H.B. testified that Romankewiz caused only "a little bit" of trouble in her relationship with her father and that she bore no animosity towards Romankewiz, during the June 1, 1999 counseling session, Parsons recorded that H.B.'s

---

[7] H.B.'s friend did testify that she witnessed Brown strike H.B. on one occasion and also saw "weird" touching and wrestling between them. Romankewiz and Brown's father, on the other hand, both testified that they never witnessed any inappropriate behavior directed toward H.B. by her father.

"[d]epression appears to happen a lot when [H.B.] is at her dad's, where she can't stand [Romankewiz]. . . .  It seems like [H.B.'s father and Romankewiz] have no time for [H.B.]. . . . [H.B.] says she hates [Romankewiz] for the way she tries to change her dad and his relationship with [H.B.]."  Although at the next counseling session, held a week later, H.B. reported that "things [were] going very well between her, and her dad and [Romankewiz]," at the July 6, 1999 counseling session—held just one week before H.B.'s public accusation that her father had molested her—Parsons recorded that "[H.B.] says she's not used to no relationship with her dad.  They have always had one, [Romankewiz] got mad, the D.T. which stood for 'Damned Tramp' called [H.B.] a 'Spoiled Little Bitch,' and [Brown's] 'Precious Little Daughter.'"

The state argues that this impeachment evidence is cumulative, given that Brown's counsel impeached H.B. with her school assignment, in which she had written that one of her goals was to prevent her father from marrying Romankewiz, and H.B.'s friend's testimony that H.B. "hated" Romankewiz.  While it is true that "the failure to present additional . . . evidence that is merely cumulative of that already presented does not . . . establish prejudice," *Getsy v. Mitchell*, 495 F.3d 295, 313 (6th Cir. 2007) (en banc) (internal quotation omitted), *cert. denied*, 128 S. Ct. 1475 (2008), we disagree that this evidence was "merely cumulative."  Evidence is cumulative when it supports a fact already established by existing evidence, *Stewart v. Wolfenbarger*, 468 F.3d 338, 358 (6th Cir. 2006); adds very little to the probative force of the other evidence in the case, *Clark v. Mitchell*, 425 F.3d 270, 294 (6th Cir. 2005); is merely a repetition of previous testimony, *United States v. Castle*, 83 F. App'x 977, 977 (9th Cir. 2003); or—in the case of undisclosed impeachment evidence—when the witness has already been sufficiently impeached at trial, *Edmond v. Collins*, 8 F.3d 290, 294 (5th Cir. 1993).

It is only in this last category that the missing evidence in this case might plausibly be characterized as cumulative, but we disagree that H.B. was so effectively impeached by defense counsel at trial that the addition of this evidence could not have caused significant further deterioration of her credibility.  On the critical issue of H.B.'s feelings toward Romankewiz, the impeachment evidence that was introduced was

limited principally to the school assignment and H.B.'s friend's statement that H.B. "hated" Romankewiz. But the school assignment was written months before H.B. publicly accused her father of molesting her, diminishing its relative importance, i.e., it does significantly less to undermine her credibility than do her statements, uttered less than one week before she accused her father of molesting her (and contemporaneous with her learning that Romankewiz's divorce had become final), that Romankewiz was a "Damned Tramp" who caused her to have "no relationship with her dad." Second, the friend's testimony is far less damaging to H.B.'s credibility than H.B.'s own words, especially given when those words were spoken and how significantly they contradicted her trial testimony.

There were also other revelations contained in the counseling notes that certainly merited exploration by defense counsel, and which could have further eroded H.B.'s credibility. For example, at the first counseling session after the alleged assault, H.B. told Parsons that she had felt suicidal and "stuck a gun in her mouth" four months earlier (which would have been approximately two months *before* the alleged assault), and could have led defense counsel to explore carefully the state of H.B.'s mental health around the time she says she was victimized. Also, on direct examination, H.B. testified that she was always truthful with her father, but the counseling records contradict this.

Admittedly, and as noted by the district court, the counseling notes would also have revealed some information damaging to Brown. *See Brown*, 2006 WL 2669194, at *10. Specifically, in the May 11 session, H.B. stated that her father "smacked her around some" and that her physician had called protective services. Similarly, in the July 6 session, H.B. said that "she ha[d] covered up for her dad's abuse a lot, when she had bruises." Nevertheless, these instances of non-sexual abuse are not what Brown was on trial for, and H.B. had already testified about physical abuse on direct examination. Importantly, H.B. never revealed anything at all about sexual abuse to Parsons until *after* she had already publicly accused her father and filed a report with the police.[8] Only in

---

[8]Although H.B. did, during the June 29 counseling session, mention a "secret" that she would soon reveal to Parsons, Parsons wrote at the time that H.B.'s comment "seem[ed] in good humor and light hearted." By her comment, H.B. might have been referring to the sexual assault she later disclosed to

these post-accusation counseling sessions do any of the supposedly corroborative details that the district court found so compelling come to light.

Where there is relatively little evidence to support a guilty verdict to begin with (e.g., the uncorroborated testimony of a single witness), the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt. *See Strickland*, 466 U.S. at 696; *see also Hodge v. Hurley*, 426 F.3d 368, 376 (6th Cir. 2005) (finding prejudice in sexual abuse case where there was no physical evidence, and case turned entirely on credibility of dueling witnesses). In this case, the verdict turned entirely on H.B.'s credibility as a witness, and Brown's attorneys should have taken all reasonable steps to investigate evidence relevant to her credibility; their failure to do so left important facts undiscovered. Given the nature of this missing evidence, its absence was an error sufficient—where there was no other evidence of Brown's guilt—to undermine our confidence in the outcome of his trial. *See Strickland*, 466 U.S. at 694.

## III. Conclusion

For the foregoing reasons, the decision of the district court is REVERSED. We REMAND with instructions to grant a conditional writ of habeas corpus, giving the State of Michigan 180 days from the date of this opinion's entry to commence a new trial against Brown, or, failing that, to release him.

---

Parsons (or to the fact that she planned to charge such conduct against her father), but it is impossible to know exactly what H.B. meant, and we cannot give such an ambiguous statement much weight in assessing prejudice against Brown.

---

**CONCURRENCE**

---

CLAY, Circuit Judge, concurring, in which Judge Moore joins.  Although I concur in Chief Judge Boggs' opinion for the Court, I write separately to emphasize an important issue regarding the standard of review that governs our consideration of this habeas petition.

Because the district court concluded that the Michigan Court of Appeals had ruled on the merits of Brown's ineffective assistance of counsel claim, the district court applied AEDPA's deferential standard of review under 28 U.S.C. § 2254(d).  We now reject the district court's conclusion that such deference is appropriate, and, for the reasons set forth in Chief Judge Boggs' opinion for the Court, instead conclude that Brown's claims are subject to *de novo* review despite the fact that the Michigan Court of Appeals purported to resolve that claim on the merits.  While I concur in this conclusion, our holding that deference under AEDPA is inappropriate under these circumstances bears further consideration.

In reaching this conclusion, we have relied on a line of cases from this Court and our sister circuits holding that AEDPA's deferential standard of review does not apply where substantial new evidence is presented in support of a petitioner's *Brady* claim.  Our decision here expressly recognizes that this same principle "applies generally" to a broader universe of claims.  In that respect, our decision today represents a natural but important progression of this body of case law.

**I.**

In many cases, ambiguities in the record make it difficult to determine whether the state courts resolved a particular claim "on the merits" for purposes of 28 U.S.C. § 2254(d).  *See Harris v. Reed*, 489 U.S. 255, 261 (1989).  Here, however, there is no serious question that Brown pressed his ineffective assistance of counsel claim before the state courts, asserting, just as he does in his federal habeas petition, that his trial

counsel failed to investigate whether Parsons' counseling records contained pertinent information necessary to his defense. Brown, however, was unable to present critical evidence in support of that claim. Despite all indications that Parsons' counseling records contained information necessary to Brown's defense, Brown's trial counsel entirely failed to pursue the matter. Nevertheless, the Michigan Court of Appeals denied Brown's request for a *Ginther* hearing.[1] *People v. Brown*, No. 227953, 2003 WL 133055, at *6 (Mich. Ct. App. Jan. 3, 2003). Instead, the Michigan Court of Appeals expressly "limited" its review of Brown's claim "to mistakes apparent on the record." *Id.* at *2. As a result, Brown, through no fault of his own, was left without access to whatever information Parsons and her counseling records may have been able to offer in support of his *Strickland* claim.

The Michigan Court of Appeals thus never considered significant evidence that would have supported Brown's claim. Nevertheless, without knowing what information Parsons' records may have yielded, the Michigan Court of Appeals held that "the decision whether to present the victim's counselor in order to impeach the victim was a matter of trial strategy," and concluded that Brown had "failed to overcome the presumption of sound trial strategy or show[] that there [was] a reasonable probability that counsel's failure to call this witness deprived him of a substantial defense or otherwise affected the outcome." *Id.* at *4. In so ruling, the Michigan Court of Appeals appears to have resolved Brown's *Strickland* claim "on the merits."

Under AEDPA, that fact typically requires deference to the state court adjudication. This Court, however, has recognized that an important exception to the deference owed state courts under AEDPA exists where substantial new evidence in support of a petitioner's claim arises during federal habeas proceedings. *See, e.g.*, *Joseph v. Coyle*, 469 F.3d 441, 469 (6th Cir. 2006). In such cases, we have construed the development of new evidence as giving rise, in effect, to a new claim, and thus we have held that deference is not required under § 2254(d).

---

[1] Under Michigan law, a defendant asserting an ineffective assistance of counsel claim may request a *Ginther* hearing to develop an evidentiary record to support his claim. *See People v. Ginther*, 212 N.W.2d 922, 924 (Mich. 1973).

That is precisely the case here.  Because the Michigan courts refused to permit Brown to pursue evidence critical to his *Strickland* claim, Brown was never able to press the specific claim he raises here:  whether, in light of the information contained in Parsons' records, Brown's trial counsel performed deficiently.  As a result, there is no relevant state court adjudication of the merits of Brown's claim to which we could defer.  Under such circumstances, as Chief Judge Boggs' opinion explains, the deference due state court adjudications under AEDPA is inapposite and inappropriate.

What Chief Judge Boggs' opinion leaves unstated, however, is that our holding today represents an important and natural progression of this Court's prior jurisprudence in this area.  Until today, this Court has abandoned AEDPA's deferential standard of review based on new evidence only in the limited context of *Brady* claims.  *See, e.g.*, *Joseph*, 469 F.3d at 469 ("If [petitioner] were now bringing the same *Brady* claim, *i.e.*, one premised on the same suppressed evidence, then it would be a 'claim that was adjudicated on the merits in State court proceedings,' and we would review the state court's decision only for whether it 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'").  A number of other circuits also have reached the same conclusion in the context of *Brady* claims.  *E.g.*, *Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003) ("AEDPA's deference requirement does not apply when a claim made on federal habeas review is premised on *Brady* material that has surfaced for the first time during federal proceedings."); *Rojem v. Gibson*, 245 F.3d 1130, 1140 (10th Cir.2001) (reviewing *Brady* claim *de novo* when exculpatory material was presented for first time in federal habeas proceedings).  In each of these cases, the federal courts declined to apply AEDPA's deferential standard of review because the petitioner identified substantial new evidence that was never considered by the state courts.

Today we conclude that, although most of these decisions have arisen in the context of *Brady* claims, there is no basis for limiting the rule to such claims.  Rather, as we hold today, this principle "*applies generally*" whenever substantial evidence supporting a habeas claim comes to light during a petitioner's federal habeas

proceedings, or whenever the reviewing state court improperly limits the scope of its review when considering a defendant's federal constitutional claim.

**II.**

Our broader application of *Joseph* follows directly from the language of the statute and comports with this Court's relevant jurisprudence.  By its very terms, AEDPA applies only to habeas claims that were "adjudicated on the merits in State court . . . ."  28 U.S.C. § 2254(d).  Thus, regardless of the nature of a petitioner's claim, deference is required only where the state courts in fact adjudicated a claim "on the merits."  Where, however, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.  *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).

The lesson of *Joseph* and other such cases is that there is no state court adjudication "on the merits" to which the federal courts could defer when evidence critical to a petitioner's claim was never before the state courts.  *See* 469 F.3d at 469. Regardless of whether the state courts have purported to resolve a particular claim on the merits, the federal courts are obliged to determine whether that claim in fact was addressed by the state courts.  *See, e.g.*, *Cargle v. Mullin*, 317 F.3d 1196, 1206-07 (10th Cir. 2003) ("Neither of these decisions assessed the aggregate prejudice arising from the several constitutional errors we find here.  Thus, our cumulative-error review is not restricted by § 2254(d)(1)'s limited focus . . . ."); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir.2002) ("AEDPA deference does not apply to [a petitioner's] perjury claim . . . [when] [e]vidence of the [claim] was adduced only at the hearing before the [federal] magistrate judge.").

Building on *Joseph*, the import of our holding here is that this principle applies generally, regardless of the nature of the claim presented.  Because AEDPA does not apply where critical evidence in support of a petitioner's claim was never considered by the state courts, the availability of significant new evidence demands that the federal courts take a fresh look at that claim.  *See Holland v. Jackson*, 542 U.S. 649, 653 (2004) (noting that "[w]here new evidence is admitted, some Courts of Appeals have conducted

de novo review on the theory that there is no relevant state-court determination to which one could defer" and "[a]ssuming . . . that this analysis is correct and that it applies where . . . the evidence does not support a new claim but merely buttresses a previously rejected one"); *Monroe*, 323 F.3d at 299 n.19 (noting that *de novo* review is not appropriate whenever only "a scintilla of new exculpatory material comes to light in federal proceedings"). Although AEDPA imposes a requirement of deference to state court adjudications, "[w]e can hardly defer to the state court on an issue that the state court did not address." *Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001). In such circumstances, federal habeas review of that claim "is not circumscribed by a state court conclusion." *Wiggins*, 539 U.S. at 534.

Simply put, deference under AEDPA is inappropriate, and not required by statute, where significant new evidence relevant to a petitioner's claim becomes available during federal habeas proceedings or the state courts improperly failed to consider significant evidence relevant to that claim. In this case, because the newly-available evidence is central to Brown's *Strickland* claim, we must make an independent assessment of whether this evidence supports habeas relief.